**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-427 (DLF)** |
| **DAN EDWIN WILSON,** | **Case No. 24-cr-238 (DLF)** |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

Dan Edwin Wilson planned for the January 6, 2021 riot for weeks.  He conspired with others and traveled to Washington, D.C., for January 6, with the goal of using the threat of violence to disrupt the peaceful transfer of power.   He called on others to "follow him," and promised, "I'll show you a symphony of destruction."   On January 6, as he approached the U.S. Capitol building, Wilson communicated to other members of the Oath Keepers and Three Percenters, calling for reinforcements: "The people are pushing on the Capitol.   We need all hands on deck."   Wilson donned a gas mask and carried what appeared to be bear spray and joined a mob of other rioters in breaking into and occupying the U.S. Capitol building.  After exiting the building, as the riot continued, Wilson observed the crowd from the steps of the East front and called out, "1776.2!"

In addition to his riotous conduct on January 6, Wilson—who has an extensive criminal record, including multiple felony convictions—unlawfully possessed multiple firearms, which the FBI discovered in Wilsons' home hidden by clothing.  For the reasons set forth herein, for his convictions for Conspiracy To Impede or Injure Officers, Possession of a Firearm by a Prohibited Person, and Possession of an Unregistered Firearm, the United States requests that this Court depart or vary upwards to sentence Wilson to 60 months of incarceration, 36 months of supervised

1

release, $2,000 in restitution, and a special assessment of $300.   The United States recommends an upward departure or variance from the government's calculated advisory Guidelines range of 33–41 months to reflect Wilson's extensive criminal history and the gravity of Wilson's conspiratorial conduct, including his planning and preparations with others for the attack on the U.S. Capitol on January 6th—an attack that was clearly calculated to influence and affect the conduct of the United States government and to disrupt the peaceful transfer of power.

## I.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Offense filed in this case, ECF 59 at ¶¶ 1–7,[1] for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.[2]

---

[1] The defendant is pending sentencing in two cases, *United States v. Dan Edwin Wilson*, 23-cr-427 (related to his criminal January 6, 2021 conduct), and *United States v. Dan Edwin Wilson*, 24-cr-238 (related to his unlawful possession of firearms).   The latter case was transferred from the Western District of Kentucky for the defendant's plea and sentencing.   For ease of reference, unless otherwise stated, all docket references herein are to the defendant's January 6 case, 23-cr-427.   References to his transferred case will be cited as "24-cr-238, ECF No. 1."

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05.   That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum.   However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

**B.      Wilson's Role in the January 6, 2021 Attack on the Capitol**

*"I Am Ready To Lay My Life on the Line.*
*It Is Time for Good Men To Do Bad Things":*
*Wilson's Plans for January 6, 2021*

Shortly after the 2020 presidential election, Wilson began planning and coordinating with others to take action to oppose the peaceful transfer of power.   Much of Wilson's coordination and planning took place through groups organized over Telegram, an encrypted messaging application.   Wilson planned, coordinated, and conspired with, among others, David Scott Kuntz, his codefendant who is pending trial before this Court.   *See United States v. Kuntz*, 23-cr-427-2 (D.D.C.) (trial set for October 15, 2024).   As early as November 2020, Kuntz organized a Telegram group called "Coalition of the Unknown," which Wilson participated in under the username "Live Wire."   *See* ECF No. 59 at ¶¶ 8–9.

In late November and early December 2020, Wilson coordinated with others, including Kuntz, to come to Washington, D.C. for a "Stop the Steal" rally on December 14, 2020.[3]   Wilson's aims were not peaceful.   On November 24, 2020, in discussing the event with Kuntz and others via the Coalition of the Unknown Telegram group, Wilson wrote, "Ready to kick some antifa ass!!!"   Exhibit 1 at 2.   Wilson later added, "To be honest personally I don't give a shit we can show up in civilian clothes and just walk the streets in a big group.   I'm just looking for an opportunity to get some and call it self-defense."   Exhibit 2 at 3.   In other messages, Wilson made clear that what he was saying in writing may have been only the tip of the iceberg.   When another individual said, "The Militia is on alert status," Wilson responded, "We all are.   Gotta coordinate

---

[3] Wilson and Kuntz previously attended the November 14, 2020, "Stop the Steal" rally in Washington, D.C. together.

privately we can't trust any of these apps."   Exhibit 3 at 4.   Wilson told the group, "I'm working out bail money ahead of time."   Exhibit 4 at 7.

On November 29, 2020, in the Coalition of the Unknown Telegram group, Wilson discussed the importance of coordinating and training with other Three Percenters.[4]   In response to others' messages about the need to "act now," and that others had been participating in "Gorilla warfare training," Wilson responded, "[A] lot of people are preparing for Armageddon but they're losing all the little battles before then.   If it wasn't for the rallies none of us would even know each other."   Exhibit 5 at 1–2.   Wilson added, "We worked on squad movements this weekend." *Id.* at 3.   Later that same day, Wilson wrote to the group, "I'm willing to do whatever.   Done made up my mind.   I understand the tip of the spear will not be easy.   I'm willing to sacrifice myself if necessary.   Whether it means prison or death."   Exhibit 6.

As early as November 30, 2020, Wilson and Kuntz also began planning to travel to Washington, D.C. for the "Million Militia March" planned for January 20, 2021.   Exhibit 7 at 1. Kuntz shared a flyer for the event, which depicted two assault-style rifles in the center, along with an American flag and a Gadsden flag on either side.   *Id.*   Kuntz wrote, "January 20 will be the big one," to which Wilson agreed.   *Id.* at 2.   Wilson added, "The first question that pops in my mind is can we really get the militia groups to gather in those large numbers and on top of that if

---

[4] The Coalition of the Unknown Telegram group included Three Percenters from different militia groups.   The Three Percenters are a group of individuals, including, as relevant to the defendant, militia groups, taking their name from the incorrect belief that only three percent of American colonists took up arms against the British during the American Revolution.   On January 6, 2021, Wilson was a member of the Gray Ghost Partisan Rangers, a Three Percenter militia.   *See* ECF No. 59 at ¶ 9.   Wilson, who has never served in the United States Armed Forces or as a law enforcement officer, also identifies as an Oath Keeper.   *See* ECF No. 60 at ¶ 135.

we try to walk in in small groups armed they might try to isolate us on our way in if we get a massive group I'm not sure what they can really do logistics would be a major issue in my opinion." *Id.* at 3.

Kuntz added that they should be prepared to combat the police on December 12 and January 20 in Washington, D.C.: "Ok here is a thought to keep in [mind] the feds are working with the police to combat any problems from the patriots.   Ok i think they are going to use some kinda gas to stop us from doing anything when the shit starts am i a little off on this one.   Want to see what you all think on this." *Id.* at 5.   He added, "You can do what you all want but im not going unarmed to this event i think its gonna be bad for them not us." *Id.* at 7.   Wilson agreed, but emphasized the need for militia groups to be coordinated: "There are a lot of events being announced for Washington DC I will definitely be there on the 12th as far as the militia march goes if we're going to try to do a national event and actually walk in armed we are going to have to try to get everybody coordinated so we can go in together that way small groups cannot be targeted by federal law enforcement."   Exhibit 8 at 4.



**Live Wire**                                                          10:59:05 AM
There are a lot of events being announced for Washington DC I will definitely be there on the 12th as far as the militia march goes if we're going to try to do a national event and actually walk in armed we are going to have to try to get everybody coordinated so we can go in together that way small groups cannot be targeted by federal law enforcement

Wilson's messages in the Coalition of the Unknown Telegram group made clear that his plans were for a broader American civil war.   On December 2, 2020, another individual wrote, "[T]his is going to end in a total revolution."   Exhibit 9 at 1.   Wilson responded, "Unfortunately

I believe that wholeheartedly." *Id.*   Kuntz responded, "its time to show them who owns this

country." *Id.* at 2.   Wilson replied, "May the Lord Jesus Christ our Savior lead us through the

valley of the shadow of death!!" *Id.*   Later that same day, Wilson messaged, "Ooh rah!!!" with

a skull emoji, in response to individuals who wrote, "They drew first blood now we will draw the

last," and, "We have two months.   If that." *Id.* at 5.   Wilson's rhetoric escalated from the general

to the specific in planning for a civil war.   That same day, Wilson messaged the group:

> One thing that Has to be considered when talking about this subject is what if the
> roads shut down will the military set up roadblocks I'm in Kentucky so we can
> move throughout the woods. it may be hard especially at first to gather all troops in
> one spot everyone needs to have local RP's and then we'll go from there
>
> In my personal opinion it'll be somewhat like an underground railroad you will
> only be able to carry what you can carry we will need the support people that are
> still in their homes

*Id.* at 7.   Wilson continued:

> Another question I have been posing to people is if it does turn out to be guerrilla
> warfare militia style movement we need to try to come up with some kind of signal
> that can be placed in a window or on a tree or something to let us know where the
> safe houses are
>
> If you can get 40 to 50 people moving as one force with concealed movement that
> would be hard to stop.

*Id.*   Wilson added:

> Ham radios will be great and I've always been told you listen at 6 AM a lot of us
> have small radios that would be able to receive messages but not transmit far
> enough to respond but if we can hear the radio waves so can the enemy

*Id.*

As the December 12, 2020 rally approached, Wilson and Kuntz continued to discuss their

plans for violence in Washington, D.C., including debating whether they should bring guns or

wear "militia clothing."   Exhibit 10 at 1; *see also* Exhibit 11 at 5–6. On December 11, 2020,

Wilson shared a link to an hour-long video entitled, "Oath Keepers founder Stewart Rhodes urges

Americans to prepare for TOTAL WAR."   Exhibit 12.

On December 12, 2020, Wilson and Kuntz traveled to Washington, D.C., to participate in

the Stop the Steal rally that took place that day.   Wilson carried bear spray and wore hard-knuckle

gloves. Below are stills from open-source videos depicting Wilson (indicated in red) and Kuntz

(indicated in yellow), in Washington, D.C. on December 12, 2020.   In this still, Wilson and Kuntz

both make a hand symbol identifying themselves as members of the Three Percenters.[5]



Later in the evening on December 12, 2020, Wilson is captured in open-source video footage, next

to Kuntz, as they stand near a police line.   Wilson is carrying bear spray and wearing hard-knuckle

gloves (both indicated in green).

---

[5] While Wilson and Kuntz make a three-fingered hand symbol associated with the Three
Percenters, other members hold up four fingers, in a hand symbol generally associated with support
for then-President Trump and a call for "four more years."



The next morning, Wilson reported to the Coalition of the Unknown Telegram group that he had engaged in the violence he had been planning in Washington, D.C.  Another individual wrote to the group, "Wait, they stabbed 4 [Proud Boys] last night?"  Exhibit 13.  Wilson responded, "True.  But we hammered their asses all day!!  Stomped a couple out myself!!!"  *Id.*  In another message he added, "Stomped some antifa ass this weekend and yes it did feel good."  Exhibit 14 at 3.

After the December 12, 2020 rally, Wilson and Kuntz continued to plan for the Million Militia March set for January 20, 2021.  On December 14, 2020, Kuntz wrote:

> This is Reaper. January the 20th in Washington D.C. is our day they will see we are not playing anymore we are going fully armed.  No more fucken games guy's you are in this 100% or your out and be a couch keyboard patriot we go in numbers they will not be able to do shit to us you must not be scared and be ready to not go home if something goes down you must start making a big stand no more rules this is our country no there's if you are in then say you are in and mean it no i will be there and not show up tell all groups you no to be thete in force.
>
> Tell all guy's no fucken around on this time to do what we have been training for.

*Id.* at 1–2.   Wilson responded, "Everyone needs to start reaching out to everybody you know every state you know this is not gonna be an easy task to organize but we have to organize and go in together come out together or none of us come the fuck out."   *Id.* at 2.   Kuntz replied, "Tell and bring all on this we go in numbers they won't do shit guy's but watch.   Dan3% is right on this one we go together."   *Id.*

While Wilson, Kuntz, and others had been planning for the Million Militia March on January 20, 2021 in Washington, D.C., their plans ultimately shifted to January 6, 2021.   A few days after then-President Trump tweeted that it was "[s]tatistically impossible to have lost the 2020 Election," and there would be a "[b]ig protest in D.C. on January 6th," Kuntz messaged the Coalition of the Unknown Telegram group that "January the 6th will be the target date for D.C. this goes to all groups that can help to defend those that can not defend themselves."   Exhibit 15 at 1; *see* ECF No. 59 at ¶ 9.   Wilson responded, "Ooh Rah.   Curb stomp crew all in!!!"   Exhibit 15 at 1; *see* ECF No. 59 at ¶ 9.

 **David** admin                                                        7:32:54 AM
January the 6th will be the target date for D.C. this goes to all groups that can help to defend those that can not defend themselves.

 **Live Wire**                                                        7:36:36 AM
Ooh Rah. Curb stomp crew all in!!!

Kuntz replied, "Hell ta D.C. here we come."   Exhibit 15 at 62; *see* ECF No. 59 at ¶ 9.   Wilson added, "We are willing to work and coordinate with others but I am a gray ghost ranger."   Exhibit 15 at 2; *see* ECF No. 59 at ¶ 9.   Wilson added, "For the new members in case you are not aware DC on the sixth here we come."   Exhibit 16 at 1; *see* ECF No. 59 at ¶ 10.   Another individual

9

responded with the below image of the Capitol, with superimposed text that called for rioters to "Occupy Congress" on January 6, 2021, and promised, "If they won't hear us, they will fear us." Exhibit 16 at 1.



Wilson responded moments later, "Some of us in here are extremely active patriots so if you want to start getting boots on the ground reach out we do the damn thing."   *Id.* at 2; *see* ECF No. 59 at ¶ 10.

On December 22, 2020, another individual in the group sought to clarify the plans for January 6, 2021: "What's the current thoughts on Battle rattle?"   Exhibit 16 at 2; *see* ECF No. 59 at ¶ 11.   Wilson responded, "Everyone has differing opinions my personal opinion is if we're going to go in and take over the world Guns up.   if we're just trying to put on a show leave them at home."   Exhibit 16 at 3; *see* ECF No. 59 at ¶ 11.   Wilson added that he would be wearing a plate carrier, but that he would not bring firearms because he was "a hands-on kind a guy." Exhibit 16 at 3; *see* ECF No. 59 at ¶ 11.   He added, "I have to admit I have carried my expandable baton both times I've been there I understand it's against the rules but I haven't had a problem yet

hard knuckle gloves are a must."   Exhibit 16 at 5.   Another individual wrote to the group, "Let

us be the 3%."   Exhibit 17 at 4.   Wilson replied, "It is an easy choice but it's not an easy choice[.]

I stand with you all[.]   I will go down swinging."   *Id.*; *see* ECF No. 59 at ¶ 11.   Wilson later

clarified that he would not be without weapons in Washington, D.C.: "mace or bear spray is also

a good idea I will have some with me along with smokes flash bangs hard knuckles and baton

camel pack and I will wear my plates this time with my IFAC."   Exhibit 17 at 8.   Another

individual shared the below image calling for rioters to "#OccupyCongress" and "Every State

Capitol Building."   *Id.*



Wilson asked for permission to share that image with others.   *Id.*

In mid-December, Wilson and Kuntz shifted their organizing efforts from the Coalition of

the Unknown Telegram group to another Telegram group called "United Front."   On December

22, 2020, another individual shared a video with the following description, "Oregonian citizens

stormed their state capitol and sung the national anthem as the police declared an unlawful

assembly.  @ProudBoysUncensored."  Exhibit 18 at 1–2.  Another individual responded, "We have to do it on a weekday as well."  *Id.* at 2.  Wilson replied, "Yes."  *Id.*  On December 23, 2020, Wilson shared a link to an open letter from the website oathkeepers.org, entitled, "Open Letter to President Trump: You Must Use Insurrection Act to 'Stop the Steal' and Defeat the Coup."  Exhibit 19; *see* ECF No. 59 at ¶ 12.

On December 24, 2020, Wilson reiterated his plans for January 6, 2021: "It is my understanding that is for the 20th.  I will be wearing plates I will be taking smokes flash bangs hard knuckle gloves bear spray but no firearms."  Exhibit 20 at 2.  Wilson clarified, "If the decision is made to go armed it Hass to be everybody on the same page and the moment we march in there we have to be willing to not go home and take over.  Just my opinion."  Exhibit 20 at 4.  Another individual explained, "Yes a lot is happening legally and a lot can happen on the 6th. The most important thing is for the Electoral College results to get contested and that Patriotic Militias set differences aside and gather together."  Exhibit 20 at 5; *see* ECF No. 59 at ¶ 13. Wilson responded, "In my opinion I don't think it's time to gun up for the sixth we have to play this out but if they seat biden on the 20th all bets are off it's gonna happen even if Trump wins we have to get this government under control it's been crossing my mind if we go to a Civil War do we try to take Washington DC first or do we try to take state capitals first."  Exhibit 20 at 5; *see* ECF No. 59 at ¶ 13.

 **Live Wire**                                                    11:28:41 PM

In my opinion I don't think it's time to gun up for the sixth we
have to play this out but if they seat biden on the 20th all bets
are off it's gonna happen even if Trump wins we have to get this
government under control   it's been crossing my mind if we go
to a Civil War do we try to take Washington DC first or do we try
to take state capitals first

Another individual wrote, "Most of our Militias are defensive and are great position to storm state capitals.   I desire to lead an offensive on DC and establish an anti Fed Zone War camp.   Anyone with me contact me at protonmail."   Exhibit 20 at 6.   Wilson added, "I've been trying to have serious conversations with my family and I know we're supposed to be celebrating the holidays but tomorrow when we get together I'm going to have a serious conversation."   *Id.*   Later that day, another individual wrote, "the intention on the 6th is for Congress to reject the Electoral College vote and to get the Supreme Court to hear We The People and examine the evidence of Voter Fraud."   Exhibit 20 at 8; *see* ECF No. 59 at ¶ 15.   Wilson responded, "We have more and more every day citizens starting to stand up we have to have these people behind us in order to support the movement and make this work."   Exhibit 20 at 8; *see* ECF No. 59 at ¶ 15.   Another individual responded, "Rebellion or resistance if we aren't heard."   Exhibit 20 at 9.   Wilson added, "It will not seem like it but they're all looking to us to lead them all the patriots that have been active an out there in fighting the people are looking to us to lead them."   *Id.*

On December 27, 2020, in the United Front Telegram group, an individual shared the below image of a building labeled "Biden Harris" being blown up, with the caption, "Premieres Jan 6th 'Be There Will Be Wild.'"   Exhibit 21 at 1; *see* ECF No. 59 at ¶ 16.

13



Wilson messaged the group a few seconds later, "I am ready to lay my life on the line. It is time for good men to do bad things."   Exhibit 21 at 1; *see* ECF No. 59 at ¶ 16.   Later that day, another individual asked, "Is Reaper going to DC?"   Exhibit 21 at 6; *see* ECF No. 59 at ¶ 17.[6]   Wilson responded, "We will be there."   Exhibit 21 at 6; *see* ECF No. 59 at ¶ 17.   Another individual asked, "Yall in the same Squad trip Wire?   Or same Militia Group."   Exhibit 21 at 6; *see* ECF No. 59 at ¶ 17.   Wilson responded, "Yes."   Exhibit 21 at 6–7; *see* ECF No. 59 at ¶ 17.

---

[6] "Reaper" was a moniker used by Kuntz.   *See* ECF No. 59 at ¶ 17.

Later that day, Kuntz and others discussed the violence they had planned for January 6, including that they would "[p]ut an end to an endless amount of commies and Tyrants," "[b]e the angel of death," and, as one individual wrote, "hit[ ] the knee caps to hear the bones crack and the loud screams of suffering." Exhibit 21 at 10–11.   Wilson added, "I ain't nobody but when it comes down to it follow me and I'll show you a symphony of destruction."   *Id.* at 11; *see* ECF No. 59 at ¶ 18.   Kuntz responded, "Come on the 6th lets do this shit."   Exhibit 21 at 11; *see* ECF No. 59 at ¶ 18.



Wilson added, "The time is now."   Exhibit 21 at 11; *see* ECF No. 59 at ¶ 17.

On December 27, 2020, Kuntz shared an image of another Tweet from then-President Trump, which read, "See you in Washington, DC, on January 6th.   Don't miss it.   Information to follow!"   Exhibit 21 at 13; *see* ECF No. 59 at ¶ 19.   Kuntz added, "He is asking us to be there." Exhibit 21 at 13; *see* ECF No. 59 at ¶ 19.   Wilson responded, "May the Lord our Savior Jesus Christ lead us through the valley of shadow of death!!!"   Exhibit 21 at 14.   He added, "Y'all

wanna do it.   Ask your self.   Are you really ready.   This is not for the faint of heart."   *Id.*; *see* ECF No. 59 at ¶ 19.   Kuntz added, "Good he does need us im going armed period."   Exhibit 21 at 14; *see* ECF No. 59 at ¶ 19.   Another individual added, "Agreed hot it is."   Exhibit 21 at 14. Kuntz added, "Yes a lot of groups are going in hot."   Exhibit 21 at 15.

### *"1776.2!": The Attack on the U.S. Capitol Building*

On January 5, 2021, Wilson and Kuntz traveled together to Washington, D.C.   *See* ECF No. 59 at ¶ 20.   As Wilson admitted, "[t]heir intent was to corruptly obstruct or impede Congress, including through their unlawful presence at the U.S. Capitol building, with respect to the certification of the 2020 electoral college vote."   *Id.*   On the morning of January 6, Wilson and Kuntz gathered with others near the Lincoln Memorial.   *Id.* at ¶ 21.   Later that morning, they went to the area of the Ellipse and the Washington Monument, where then-President Trump, among others, addressed the crowd.   *Id.*   From the Ellipse, Wilson and Kuntz walked with others toward the U.S. Capitol building, where they passed fencing and barricades and joined with thousands of other rioters on the grounds of the U.S. Capitol.   *Id.* at ¶ 22.

As Wilson approached the Capitol, he communicated with a group called, "STOP THE STEAL J6" via audio messages over Zello—a live voice push-to-talk communication platform available on cell phones.   At approximately 1:43 p.m., Wilson messaged the group, "The people are trying to push through the barricade at the Capitol building.   We're headed that way."   Exhibit 22.[7]   An individual responded at approximately 1:47 p.m., "Live Wire, when your team touches down in the Capitol, I need a sit[uation] rep[ort], please."   Exhibit 23.

---

[7] Video and photographic exhibits are being provided to the Court via USAfx.   Consistent with the Court's order, the United States is also provided access through the media USAfx account.

Wilson was also giving updates via Zello to another individual.   At approximately 1:44 p.m., Wilson received a message from another individual, who asked, "How many patriots do we have pushing through at the Capitol, Live Wire?"   Exhibit 24.   Wilson responded a few seconds later, "Hey, pass the word, Badlands, as fast as you can, the people are pushing on the Capitol. We need hands on deck."   Exhibit 25.   The individual responded, seconds later, "Heard, Live Wire.   Will send."   Exhibit 26.

Wilson was also passing along updates via Zello to a group called "Oath Keepers general chat."   At approximately 1:45 p.m., he shared a message to that group in which he said: "Hey, whoever's got ears on, even if you ain't in D.C., pass the word, the people are pushing on the Capitol.   We need all hands on deck."   Exhibit 27.

After he arrived at the U.S. Capitol building, open-source video and photographic footage reveals that Wilson went past the area where bike racks, barricades, and "Area Closed" signs had been set out, and climbed a set of bleachers that had been constructed on the Upper West Terrace, which overlooked the inaugural stage and West Plaza.   Moments earlier, the police line on the West Plaza had been overrun and rioters were advancing on the Capitol in large numbers.   Wilson triumphantly raised his first in the air, as he recorded the riotous crowd below, which was advancing on the building while law enforcement was in retreat.   Seeing the crowd advancing on the Capitol, Wilson turned back and walked up the bleachers—toward the U.S. Capitol building. *See* ECF No. 59 at ¶ 26; Exhibit 28 (3:34–4:03).



*Still Image from Exhibit 28 (3:55)*

At approximately 2:37 p.m., Wilson entered the U.S. Capitol building through the Upper West Terrace Door, wearing a gas mask, as seen below.   *See* Exhibit 29 (2:36:23–2:37:12).



*Still Image from Exhibit 29*

After entering the building, Wilson walked into the Rotunda, where he remained for several minutes.  *See* Exhibits 30 (2:37:44–2:40:02) & 31.  While inside, Wilson took a "selfie" photograph of himself holding up a hand sign associated with the Three Percenters.



From the Rotunda, Wilson walked through Statuary Hall, *see* Exhibit 32 (2:40:39–2:41:57), before returning to the Rotunda, *see* Exhibit 33 (2:44:46–2:45:14).   He briefly walked toward the East Rotunda Doors, and could have easily left the building.   Instead, he turned around and went back to the Rotunda, *see* Exhibit 34 (2:45:11–2:45:50), where he remained for several more minutes, *see* Exhibit 33 (2:45:45–2:46:18; 2:47:49–2:48:20).   Wilson ultimately exited the Capitol through the East Rotunda Doors at approximately 2:49 p.m.   *See* Exhibit 35 (2:48:08–2:48:57).



*Still Image from Exhibit 33*

After exiting the U.S. Capitol building, Wilson stood on the steps of the Capitol, looking out on the rioters gathered on the East front, and he called out, "We are national news, people!" Exhibit 36 (5:01–5:19).   Another rioter called out, "Welcome to history, boys and girls," and Wilson responded by exclaiming, "1776.2!"   *Id.* (6:37–6:44).

As he walked down the steps on the East front, and in other photographs, Wilson can be seen carrying what appears to be a can of bear spray, consistent with what he carried on December 12, 2020.   In the above photograph of Wilson carrying bear spray on December 12, 2020, the can is recognizable by its shape, white tip, and black container with white writing at the base.   *See* Exhibit 37 (0:45–1:20).   In the below photograph from January 6, Wilson's sweatshirt is covering the tip of what appears to be bear spray, but the base of the can (indicated in red) sticks out from under his sweatshirt and appears consistent with the bear spray he carried on December 12, 2020.

*See* Exhibit 36 (5:05–5:08); Exhibit 38 (0:02–0:13); Exhibit 39.   Notably, Wilson had advised others to bring "mace or bear spray" to Washington, D.C. for January 6, 2021.   Exhibit 17 at 8.



*Exhibit 39*

### *Wilson's False Statements to the FBI*

On March 9, 2021, Wilson was voluntarily interviewed by the FBI. Wilson stated that, after he and Kuntz attended the speech by then-President Donald Trump on the morning of January 6, they went to the U.S. Capitol building, where they passed an area where fencing was originally set up.   Wilson repeatedly denied having entered the U.S. Capitol building and claimed he did not know anyone that entered the building.   *See* Exhibit 40.   Toward the beginning of the interview,

the following exchange took place:

| | |
|---|---|
| FBI: | You were up there, right? |
| Wilson: | Yeah, I went to the rally, yeah. |
| FBI: | OK, well we have information that you were inside the Capitol. |
| Wilson: | No sir. |
| FBI: | OK.   You did not go within the Capitol? |
| Wilson: | No. |
| FBI: | OK.   Talk to us about that.   What happened? . . . How did you get up there, all that, if you weren't within the Capitol, because I have information that you were inside the Capitol. |
| Wilson: | No sir. |

*Id.* (2:02–2:25).   Wilson was admonished that it was a crime to lie to the FBI and that there was

evidence that he had entered the U.S. Capitol building; nevertheless, as the interview continued,

Wilson continued to deny that he ever entered the building.   *Id.* (2:55–3:18).   The following

exchange took place later in the interview:

| | |
|---|---|
| FBI: | You and [Kuntz] didn't plan on going in, right? |
| Wilson: | No. |
| FBI: | OK.   So, but you did go in, right? |
| Wilson: | No. |
| FBI: | You did not go in the Capitol? |
| Wilson: | No. |

*Id.* (11:43–11:51).   As the interview continued, despite being repeatedly asked whether he entered

the building—and after being advised that making a false statement could be a crime, and that

evidence existed showing his entry—Wilson continued to deny his entry into the building.   *See*

*id.* (14:00–15:13).   As summarized above, and as he now admits, Wilson was lying to the FBI in

this interview.   ECF No. 59 at ¶ 30.

### *Wilson's Unlawful Possession of Firearms*

On June 3, 2022, during the execution of a search warrant authorized on Wilson's home,

law enforcement seized evidence of Wilson's presence at the U.S. Capitol building on January 6.

Law enforcement also seized six firearms from Wilson's residence:

- A .45 caliber Rock Island Armory 1911 semiautomatic pistol, bearing serial number RIA1547427, located in a backpack.

- A 5.56 caliber long barrel M-4 style rifle with "M" logo, with no visible serial number, located in a cabinet, covered by clothing.

- A 5.56 caliber short barrel M-4 style rifle, with Anderson buttstock, with no visible serial number, located in a cabinet, covered by clothing.

- A 5.56 caliber short barrel M-4 style rifle, bearing serial number 19347295, located in a cabinet, covered by clothing.

- A 5.56 caliber 9mm M&P 9 pistol, bearing serial number HUH1149, located in a cabinet.

- A .45 caliber Rock Island Armory 1911 semiautomatic pistol, bearing serial number RIA2266246, located in a cabinet.

ECF No. 59 at ¶ 32.   Law enforcement almost seized approximately 4,800 rounds of ammunition. At least two of the firearms were loaded at the time of seizure, and, as noted, another two did not have serial numbers.   The firearms were stored in a backpack and in a cabinet in his residence, concealed within clothing, as seen below.




Notably, Wilson was not allowed to possess any firearms at the time because he had the following previous felony convictions:

- On or about July 11, 1994, in Breckenridge Circuit Court, Breckenridge County, Kentucky, in Case Number 94-CR-019, Wilson, was convicted of Burglary in the Second Degree (2 counts) and Unlawful Transaction with a Minor, each a felony.

- On or about December 19, 1995, in Jefferson Circuit Court, Jefferson County, Kentucky, in Case Number 95-CR-2600, Wilson, was convicted of Theft by Unlawful Taking over $300 (2 counts), a felony.

- On or about December 10, 1997, in Fayette Circuit Court, Fayette County, Kentucky, in Case Number 97-CR-977, Wilson, was convicted of Escape in the Second Degree, a felony.

ECF No. 59 at ¶ 32.

## II.     THE CHARGES AND PLEA AGREEMENT

On May 16, 2024, Wilson was charged, by information, with seven counts: Count One (Conspiracy To Impede or Injure Officers, in violation of 18 U.S.C. § 372); Count Two (Conspiracy To Obstruct an Official Proceeding, in violation of 18 U.S.C. § 1512(k)); Count Three (Obstruction of an Official Proceeding, Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) & 2); Count Four (Entering and Remaining in a Restricted Building and Grounds, in violation of 18 U.S.C. § 1752(a)(1)); Count Five (Disorderly and Disruptive Conduct in a Restricted Building and Grounds, in violation of 18 U.S.C. § 1752(a)(2)); Count Six (Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D)); and Count Seven (Parading, Demonstrating, or Picketing, in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G)).[8]  *See* ECF No. 54.   On May 17, 2024, Wilson was convicted of Count One ("the Section 372 offense") based on a guilty plea entered pursuant to a plea agreement.  *See* Minute Entry of May 17, 2024; ECF No. 56.

On January 18, 2023, a federal grand jury in the Western District of Kentucky returned an indictment charging Wilson with two counts: Count One (Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(2)) ("the Section 922(g)(1) offense"); and Count Two (Possession of an Unregistered Firearm, in violation of 26 U.S.C. §§ 5841, 5861(d), & 5871) ("the Section 5861(d) offense").  *See* 24-cr-238, ECF No. 2-1.   Following the transfer of

---

[8]  Wilson was first charged, on May 17, 2023, by criminal complaint with the offenses charged in Counts Three through Seven.  *See* ECF No. 1.   A federal grand jury charged him with the same five offenses in an indictment on December 6, 2023.  *See* ECF No. 26.   On April 17, 2024, Wilson was then charged by a superseding indictment with the offenses charged in Counts Two through Seven.   ECF No. 47.

that case to this district, pursuant to Rule 20 of the Federal Rules of Criminal Procedure, on May 17, 2024, Wilson was convicted of both counts based on a guilty plea entered pursuant to a plea agreement.  *See* Minute Entry of May 17, 2024; ECF No. 56.

## III.   STATUTORY PENALTIES

Wilson now faces sentencing on Conspiracy To Impede or Injure Officers, in violation of 18 U.S.C. § 372; Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(2); and Possession of an Unregistered Firearm, in violation of 26 U.S.C. §§ 5841, 5861(d), & 5871.

As noted by the Presentence Report issued by the U.S. Probation Office, PSR ¶¶ 165–67, 182 & 200–02, Wilson faces a maximum sentence of 6 years' imprisonment, 3 years' supervised release, and a fine of $250,000 for the Section 372 offense; a maximum of 10 years' imprisonment, 3 years' supervised release, and a fine of $250,000 for the Section 922(g)(1) offense[9]; and a maximum of 10 years' imprisonment, 3 years' supervised release, and a fine of $10,000 for the Section 5861(d) offense.

## IV.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *United States v. Gall*, 552 U.S. 38, 49 (2007).

---

[9] As the PSR correctly notes, because this offense was committed on June 3, 2022, prior to the June 25, 2022 law change, the statutory maximum is ten years, rather than fifteen years.   ECF No. 60 at ¶ 14 & n.2.

### A.  Guidelines Calculations

The United States respectfully submits that the PSR includes two errors.   First, the revised PSR does not include a separate Guidelines analysis for the Section 5861(d) offense, Possession of an Unregistered Firearm, in violation of 26 U.S.C. §§ 5841, 5861(d) and 5871.   *See* PSR ¶¶ 77–103. [10]   Second, as discussed below, the agreed-upon enhancement for extensive scope, preparation, and planning applies.   PSR ¶¶ 77–103.

The United States's calculation of the offense levels for each of the counts of conviction is as follows:

**The Section 372 Offense**

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2 | Obstruction of Justice Base Offense Level | **14** |
| U.S.S.G. § 2J1.2(b)(3)(C) | Extensive Scope, Planning, or Preparation | +**2** |
| | Total | **16** |

**The Section 922(g)(1) Offense**

| | | |
|---|---|---|
| U.S.S.G. § 2K2.1(a)(4) | Unlawful Possession of Firearms Base Offense Level | **20** |
| U.S.S.G. § 2K2.1(b)(1)(A) | Possession of 3–7 Firearms | +**2** |
| | Total | **22** |

**The Section 5861(d) Offense**

| | | |
|---|---|---|
| U.S.S.G. § 2K2.1(a)(4) | Unlawful Possession of Firearms Base Offense Level | **20** |
| | Total | **20** |

---

[10] U.S.S.G. § 1B.1(a)(1)–(3) describes the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments.   Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)–(3) must be "repeat[ed]" for "each count."   Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)–(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.   The revised PSR does not follow these steps.   It concludes (see PSR ¶ 81) that "Counts 1 and 2 (24cr00238) are grouped together"—a conclusion with which the United States agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

**Combined Offense Level**

| | | |
|---|---|---|
| U.S.S.G. § 3D1.4 | Grouping | **23** |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | **-3** |
| | Total | **20** |

## B. The Enhancement for Extensive Scope, Planning, or Preparation Applies

A two-level increase applies if the offense was "extensive in scope, planning, or preparation." U.S.S.G. § 2J1.2(b)(3). Wilson was no ordinary January 6 rioter. "[A] lot of thought and planning . . . went into this offense." *United States v. Reffitt*, 21-cr-32, Sentencing Transcript at 47:4–5 (D.D.C. Aug. 1, 2022) (Friedrich, J.) (applying enhancement in January 6 case where the defendant "started planning this trip a couple weeks ahead of time" and collected weapons, *id.* at 39:14–17). He is in the rare class of defendants convicted of a conspiracy offense based on advance planning for January 6. As discussed above, Wilson's preparations included his participation in multiple Telegram groups to gather rioters prepared for violence on January 6. In addition to organizing and rallying others to join him on January 6, Wilson discussed preparing for "civil war" and "tak[ing] Washington DC," Exhibit 20 at 5, and practicing "squad movements," Exhibit 5 at 3. Courts have applied this enhancement for other conspiracy defendants who engaged in advanced planning through Telegram. *See United States v. Hostetter, et al.*, 21-cr-392 (D.D.C.) (Lamberth, J.) (applying the enhancement to all six defendants). Moreover, the parties agreed this enhancement applied in entering the plea agreement. *See* ECF No. 56 at ¶ 5. Accordingly, the Court should apply the enhancement.[11]

---

[11] The application of this enhancement does not alter the final combined offense level. In the absence of the enhancement, the Guidelines for the Section 372 offense is level 14, which is 8 points lower than the offense level for the Section 922(g)(1) offense, which is 22. With this enhancement, the total offense level is 16, which is 6 points lower. In either case, the Section 372

**C. Criminal History Category**

The U.S. Probation Office calculated Wilson's criminal history as category I, which is not disputed.   PSR ¶ 114.   Accordingly, based on the government's calculation of Wilson's total adjusted offense level, at 20, Wilson's advisory Guidelines imprisonment range is 33 to 41 months' imprisonment.   Wilson's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

Although Wilson's criminal history category is I, he has an extensive criminal record not fully captured by his category.   As summarized in the PSR, Wilson has the following criminal charges and convictions:

- 1994 convictions for Second Degree Burglary; Forced Entry in a Residence; Unlawful Transaction with a Minor; and Unauthorized Use of a Motor Vehicle.   Wilson was sentenced to a term of imprisonment of seven years.   He was paroled early, in 1995, but returned to prison later that same year for parole violations.   He escaped from custody for several days in 1997, and was paroled again in 1998.   He again violated his parole in 2000. He was ultimately released in 2002.   *See* PSR ¶ 105.

- 1995 convictions for Theft by Unlawful Taking and Possession of Burglary Tools.   Wilson was sentenced to 1 year of imprisonment.   *See* PSR ¶ 106.

- A 1997 conviction for Second Degree Escape.   Wilson was sentenced to 2 years' imprisonment, suspended.   *See* PSR ¶ 107.   A second charged offense for Second Degree Felony Offenses was dismissed pursuant to a plea agreement.   *Id.*

---

offense will be "5 to 8 levels less serious than the Group with the highest offense level," and thus only one-half unit is added, adding one level to the combined offense level.   U.S.S.G. § 3D1.4.

- A 2003 conviction for Disorderly Conduct.   Additional charges of Fourth Degree Assault, Alcohol Intoxication in a Public Place were dismissed.   *See* PSR ¶ 108.

- A 2004 conviction for Possession of Marijuana.   Additional charges of Reckless Driving and Possession of Drug Paraphernalia were dismissed.   *See* PSR ¶ 109.

- A 2004 conviction for Reckless Driving.   Additional charges for Operating a Vehicle Under the Influence of Alcohol/Drugs and Criminal Mischief were dismissed.   *See* PSR ¶ 110.

- A 2005 conviction for Operating a Vehicle Under the Influence of Alcohol/Drugs. Additional charges for Reckless Driving; Possession of Marijuana; and Possession of Drug Paraphernalia were dismissed.   *See* PSR ¶ 111.

- A 2005 conviction for Operating a Vehicle While Intoxicated.   An additional charge of Operating a Vehicle with a BAC of .15 or More was dismissed.   *See* PSR ¶ 112.

- 2011 convictions for Possession of Marijuana and Operating a Vehicle Under the Influence of Alcohol/Drugs.   Wilson was sentenced to 60 days in jail, suspended.   An additional charge of Possession of Drug Paraphernalia was dismissed.   *See* PSR ¶ 113.   It is for this conviction that Wilson derives his sole criminal history point.   *Id.*

- Wilson also has a series of other arrests, for which charges were dismissed, including for Possession of a Stolen Motor Vehicle (1994), *see* PSR ¶ 116; Driving on a Suspended License, Failure To Maintain Required Insurance, Possession of Marijuana, and Possession of an Open Container of Alcohol (2005), *see* PSR ¶ 117; Public Intoxication, Possession of Marijuana, Possession of Drug Paraphernalia, and Failure of Owner To Maintain Required Insurance (2008) , *see* PSR ¶ 118; and Terroristic Threats (2011), *see* PSR ¶ 119.

31

### D.  The Court Should Vary or Depart Upwards

After determining a defendant's Guidelines range, a court then considers any departures or variances.  *See* U.S.S.G. § 1B1.1(a)–(c) and § 1B1.1, cmt. (background).   The Guidelines apply to a "heartland of typical cases."  *Koon v. United States*, 518 U.S. 81, 94–95 (1996).   A "departure" is based on "the framework set out in the Guidelines," while a "variance" is imposed "outside the guidelines framework" based under the applicable 18 U.S.C. § 3553(a) factors taken as a whole.  *United States v. Murray*, 897 F.3d 298, 309 n.8 (D.C. Cir. 2018) (cleaned up).   Specific departure statements reflect Commission guidance on what makes a case "atypical" and when departures are "encouraged."  *Koon*, 518 U.S. at 94–95.

Following *Brock*, the enhancements under Guidelines §§ 2J1.2(b)(1)(B) and (b)(2) no longer apply to convictions for 18 U.S.C. § 372 under these circumstances.   But that decision does not undercut the severity of Wilson's crime.   If anything, Wilson's preplanning, organizing, and storming of the Capitol is far more serious than interfering with a routine court proceeding.  *See Brock*, 94 F.4th at 59 ("[I]nterference with one stage of the electoral college vote-counting process . . . no doubt endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work."); *see also* Memorandum Opinion & Order, *United States v. Reffitt*, 21-cr-32, ECF No. 182 at 10 ("Following *Brock*, obstructive conduct is subject to a potential 11-point Guidelines swing depending on whether it interfered with, on one hand, a 'judicial, quasi-judicial, and adjunct investigative proceedings,' or on the other hand, any other type of formal proceeding.   This disparity—though tracking the Guidelines' text—does not reflect the importance and solemnity of the Congressional proceeding to certify the electoral vote count, nor does it reflect the gravity of [the defendant's] obstructive conduct." (quoting *Brock*, 94 F.4th

at 51)).   Although the D.C. Circuit has held that Guidelines §§ 2J1.2(b)(1)(B) and (b)(2) do not technically apply to the certification of the electoral vote count, that does not prevent this Court from considering how the uniquely horrifying events of January 6 factor into an appropriate sentence.

Precisely because the D.C. Circuit held in *Brock* that the Guidelines do not account for this crucial factor, the Court should depart or vary to impose the government's requested sentence. *See, e.g.*, *United States v. Bender*, 21-cr-508-BAH, ECF No. 161 at 3 n.1 ("The D.C. Circuit issued an opinion on March 1, 2024 in *United States v. Brock*, No. 23-3045, holding that the sentencing enhancement at U.S.S.G. § 2J1.2(b)(2) does not apply to convictions under 18 U.S.C. § 1512(c)(2) for conduct disrupting Congress's counting and certification of the electoral college votes on January 6, 2021, but that decision does not influence the outcome in that case, since the Court would have varied upwards by at least three offense levels to account for the significant disruption of a critical and important governmental function as a result of defendants' offense conduct if the specific offense characteristic at U.S.S.G. § 2J1.2(b)(2) did not apply.").   Indeed, pursuant to *Brock*, which was ultimately a technical dispute over the interpretation of a specific offense characteristic, a person who obstructed justice during a routine court proceeding, causing substantial interference, and even using violence or the threat of such violence, would receive a vastly higher punishment than a person who conspired to stop a proceeding involving the democratic transfer of power inherent to the U.S. Constitution.   That alone warrants an upward departure or variance.

### a.   *U.S.S.G. § 5K2.7 & 5K2.14*

Chapter 5, Part K of the Guidelines "identifies some of the circumstances that the

Commission may have not adequately taken into consideration in determining the applicable guideline range," which may warrant a departure.   U.S.S.G. § 5K2.0(a)(2)(A).   One such circumstance is when an offense results in "a significant disruption of a governmental function." U.S.S.G. § 5K2.7.[12]   A departure under this provision is warranted in "unusual" circumstances where the Guidelines do not reflect the appropriate punishment for the offense.   *Id*.   In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."   *Id*.

Although by its own terms Guidelines § 5K2.7 "ordinarily" does not provide for an upward departure when the offense involves obstruction of justice, the obstruction of the Electoral College certification on January 6, 2021, is the type of unusual circumstance that the Sentencing Commission could not have anticipated and that warrants an upward departure.   As the commentary explains, a departure under § 5K2.7 is appropriate if the disruption of a governmental function is "substantial," meaning "substantially in excess" of the disruption ordinarily involved in an obstruction offense.   *See* § 5K2.0 cmt. 3(B)(ii).   Rioters like Wilson who conspired to obstruct the certification proceedings on January 6 targeted the peaceful transfer of power, one of the fundamental and foundational principles of our democracy.   And Wilson was part of a mob that injured more than one hundred police officers and resulted in more than $2.9 million in

---

[12] This Guideline does not require the United States to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence."   *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

losses.[13]   Wilson "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work."   *Brock*, 94 F.4th at 59.   It was an unprecedented day in American history. Surely few, if any, disruptions of governmental functions have been more "substantial," and it was a disruption far "in excess of . . . that which ordinarily is involved in" an obstruction offense, such as impeding a single judicial proceeding.   U.S.S.G. § 5K2.0(a)(3); *id.* cmt. 3(B)(ii).   But, following *Brock*, the seriousness of the crimes committed by rioters like Wilson is not adequately captured by Guidelines § 2J1.2.   Other courts have applied § 5K2.7 in January 6 cases.   *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours").[14]

　　　If the Court decides not to apply § 5K2.7, an upward variance to the government's recommended sentence is warranted to achieve an appropriate sentence under the § 3553(a) sentencing factors.   An upward variance is appropriate when "the defendant's conduct was more

---

[13]  Given the dangerous circumstances created by the riot, the Court could depart under Guidelines § 5K2.14 in addition to, or as an alternative to, departing under § 5K2.7.   Section 5K2.14 provides for a departure if "national security, public health, or safety was significantly endangered."   The assault on the Capitol endangered the safety of the public, police, and elected officials in a way not already captured by the defendant's Guidelines range, so a departure would be appropriate. *Cf. United States v. Calloway*, No. 21-3057, 2024 WL 925790, at *3 (D.C. Cir. Mar. 5, 2024) (affirming departure under § 5K2.14 where district court found that the defendant "created a serious risk that multiple individuals could have been killed or injured").

[14]  If the Court does apply a departure, the United States requests that the Court also specify that it would have imposed the same sentence as a variance.   *See United States v. Brevard*, 18 F.4th 722, 728–29 (D.C. Cir. 2021) (upholding the district court's sentence where the departure was erroneously applied but the district court indicated that it was also imposing the sentence as a variance).

harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). Here, an upward variance is warranted to account for the unique nature and circumstances of the offense and to reflect the seriousness of the offense. As discussed throughout this memorandum, Wilson's conduct on and leading up to January 6 was a serious offense that attacked the fundamentals of American democracy. As Judge McFadden stated in a pre-*Brock* sentencing hearing:

> Regardless of whether the 'administration of justice' language actually applies to this situation, I have no doubt that the Commission would have intended for this to apply to substantial interference with an official proceeding like a certification process, which is itself more significant than almost any court proceeding. . . . [Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources.

*United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent. Tr. 9/22/22 at 86–87.

For the reasons discussed throughout this memorandum, the specific facts and circumstances of this case further support an upward variance to the requested terms of imprisonment. *See United States v. Fonticoba*, 21-cr-368 (TJK), Sent. Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance would be warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *see also United States v. Bender, et al.*, 21-cr-508 (BAH), Memorandum Opinion (March 6, 2024), ECF No. 161 at 3 n.1; *Reffitt*, ECF No. 182 at 9–11. Accordingly, the United States requests that the Court vary upwards to give effect to "the concerns underlying the Government's requests for these enhancements under the § 3553(a) factors at sentencing." *See United States v. Seefried*, 639 F. Supp. 3d 8, 20 (D.D.C. 2022).

### b. *U.S.S.G. § 3A1.4 n.4 Upward Departure*

Separately, U.S.S.G. § 3A1.4, application note 4, authorizes an upward departure because Wilson's conduct was "calculated to influence or affect the conduct of government intimidation or coercion, or to retaliate against government conduct."[15]

### i. Legal Standard

An adjustment for terrorism applies where the offense "involved, or was intended to promote, a federal crime of terrorism," which is defined by statute in 18 U.S.C. § 2332b(g)(5). *See* U.S.S.G. § 3A1.4, cmt. n.1*see United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004); *see also United States v. Hale*, 448 F.3d 971, 988 (7th Cir. 2006) (applying adjustment where the offenses themselves were not enumerated but the underlying conduct was meant to promote an enumerated offense).   Here, the United States is not seeking application of the Section 3A1.4(a) adjustment.

Rather, the United States seeks the application of Note 4 to Section 3A1.4, which provides that an upward departure is "warranted" if the defendant's "offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."   *Id.*, cmt. n.4.   When it adopted Note 4, the Sentencing Commission explained that it is "an encouraged, structured upward departure," the purpose of which is to provide courts with "a viable tool to account for the harm involved during the commission of these offenses on a case-by-case basis" and to "make[] it possible to impose punishment equal in severity to that which

---

[15] In the absence of this upward departure, the United States would submit that a sentence of 60 months is nonetheless appropriate under the Section 3553(a) factors.

would have been imposed if the § 3A1.4 adjustment actually applied."   Sentencing Guidelines, App. C, amend. 637 (2002).

A defendant's offense is "calculated to influence or affect the conduct of government by intimidation or coercion," as required by Section 3A1.4, if the offense was specifically intended to have the effect of influencing, affecting, or retaliating against government by force or the threat of force.   *See, e.g.*, *United States v. Mohammed*, 693 F.3d 192, 201 (D.C. Cir. 2012) (defendant's narcoterrorism offense had requisite "calculation" where evidence showed defendant "specifically intend[ed] to use the commission from the drug sales to purchase a car to facilitate attacks against U.S. and foreign forces in Afghanistan").   While they are related, "calculation" for the Section 3A1.4 enhancement is distinct from a defendant's particular "motive" and a defendant need not be "personally motivated by a desire to influence or affect the conduct of government," so long as defendant's crime was "calculated to have such an effect."   *United States v. Khatallah*, 314 F. Supp. 3d 179, 199 (D.C. Cir. 2018).   Although "calculation may often serve motive," the enhancement's "calculation" requirement is satisfied if a defendant's offense was "planned—for whatever reason or motive—to achieve the stated object."   *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (Section 3A1.4 applied to defendant motivated by "prestige and potential influence obtained by associating with" another terrorist, even if defendant did not share the specific political motivation of that terrorist).   Moreover, a defendant's intent to influence government conduct or retaliate against the government need not have been his "sole" or "primary" purpose and the "calculation" requirement may be satisfied even if a defendant's relevant conduct sought to "accomplish other goals simultaneously."   *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018); *see also United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014)

(defendant's "money-raising goals obviously do not preclude a finding of intent to influence government policy," even if raising money was defendant's "primary purpose").

Indeed, Section 3A1.4 is applicable regardless of a defendant's claimed magnanimous intent.   *See United States v. Christianson*, 586 F.3d 532, 539 (7th Cir. 2009) (affirming application of the adjustment for defendants who professed to try to "sav[e] our earth," because "the purpose behind defendants' actions was to further [their] political agenda: the end to industrial society"). While Wilson may claim, despite the absence of any legitimate evidence, that he had a genuine belief that the election was fraudulent, that is irrelevant.   "[I]t doesn't matter why the defendants oppose . . . the United States government—if they use violence and intimidation to further their views, they are terrorists."   *Id*.

## ii.  Wilson's Conduct and Convictions

The conduct constituting Wilson's conviction for the Section 372 offense is not enumerated under 18 U.S.C. § 2332b(g)(5).   Nevertheless, Wilson's criminal conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."   U.S.S.G. § 3A1.4, cmt. n.4(A).   As his conviction and the underlying evidence reflects, Wilson conspired to, attempted to, and temporarily did prevent Congress from certifying the 2020 Electoral College vote, through the threatened use of force.   The conviction on the Section 372 offense carries with it the finding that Wilson conspired to prevent, by force, intimidation, or threat, law enforcement and Members of Congress from discharging their duties, and to induce, by force, intimidation, and threat, law enforcement and Members of Congress to leave the place where their duties were required to be performed.   The evidence made clear that the threat of violence and force was foundational to the conspiracy.

39

While Wilson did not personally engage in violence, violence is not required for the application of the enhancement.  Courts applying Section 3A1.4 have found that engaging in violent conduct may be relevant to a defendant's terroristic "calculation" to affect the conduct of government through "intimidation or coercion," but actual violence is not necessary.  *See, e.g.*, *United States v. Hammoud*, 381 F.3d 316, 325 (4th Cir. 2004) (affirming application of Section 3A1.4 enhancement for defendant convicted of providing money laundering services to Hezbollah); *United States v. Aref*, No. 04-cr-402, 2007 WL 804814, at *4–5 (N.D.N.Y. Mar. 14, 2007) (affirming application of Section 3A1.4 enhancement to defendant's conviction for money laundering); *United States v. Benkahla*, 530 F.3d 300, 313 (4th Cir. 2008) (affirming application of Section 3A1.4 enhancement to defendant convicted of perjury and obstructing justice by lying to investigators and grand jury about terrorist associates); *United States v. Thurston, et al.*, No. 06-cr-60069-01-AA, 2007 WL 1500176, at *12 (D. Or. May 21, 2007) (holding that Section 3A1.4 does not require "substantial risk of injury"), *aff'd sub nom. United States v. Tubbs*, 290 F. App'x 66 (9th Cir. 2008); *see also United States v. Wells*, 163 F.3d 889, 899 (4th Cir. 1998) (rejecting argument by defendant convicted of mail fraud, bank fraud, interference with IRS officials, and transportation of stolen property that "terrorism" label did not apply for purposes of sentencing "[s]ince he did not commit any violent acts").  Indeed, when Congress directed the Sentencing Commission pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 to tether the Section 3A1.4 enhancement to the statutory definition of "federal crime of terrorism" and the accompanying "calculation" language in 18 U.S.C. § 2332b(g)(5)(A), rather than the separate statutory definitions of "international terrorism" or "domestic terrorism" in 18 U.S.C. § 2331, Congress deliberately omitted language from Section 2331 requiring "violent acts" or "acts

40

dangerous to human life."   *See* 18 U.S.C. § 2331(1), (5) (defining "international terrorism" and "domestic terrorism," respectively).

Regardless of the use of immediate violence, Wilson's conduct—and the conspiracy he joined—displayed a clear intent to stop Congress from certifying the results of the election, including through force, intimidation, or threats.   That conduct—calculated to stop the peaceful transfer of presidential power for the first time in the nation's history—is a quintessential example of an intent to influence government conduct through intimidation or coercion and warrants an upward departure pursuant to Note 4.   The terrorism enhancement in Section 3A1.4 is meant to "punish[] more harshly than other criminals those whose wrongs served an end more terrible than other crimes."   *Benkahla*, 530 F.3d at 313.   Here, the defendant's conspiracy centered on the threatened and actual use of force on January 6 was all enacted with a single-minded purpose: to stop the peaceful transfer of power.

### b.   Prior Applications of Note 4 in the January 6th Cases

In *United States v. Elmer Stewart Rhodes, et.al.*, 22-cr-15, Judge Mehta applied 3A1.4 n. 4 to the eight defendants convicted of seditious conspiracy and/or conspiracy to obstruct the official proceeding, in varying degrees.[16]

| Defendant | Sentencing Date | U.S.S.G. § 3A1.4, Note 4 Upward Departure |
|---|---|---|
| Rhodes | May 25, 2023 | 6 offense levels |

---

[16] Unlike in the Oath Keepers conspiracy case, in the Proud Boys conspiracy case, *United States v. Nordean, et al.*, 21-cr-175 (TJK), defendants were convicted of violating 18 U.S.C. § 1361—an enumerated offense under 18 U.S.C. § 2332b(g)(5).   Accordingly, the United States sought the enhancement to offense level 32 and Criminal History Category VI provided for by Guidelines 3A1.4(a).   *See id.* ECF No. 855.

| Meggs | May 25, 2023 | 3 offense levels |
|---|---|---|
| Watkins | May 26, 2023 | 3 offense levels |
| Vallejo | June 1, 2023 | 2 offense levels |
| Harrelson | May 26, 2023 | 1 offense level |
| Minuta | June 1, 2023 | 1 offense level |
| Moerschel | June 2, 2023 | 1 offense level |
| Hackett | June 2, 2023 | 1 offense level |

At sentencing, Judge Mehta noted that "Mr. Rhodes and his compatriots' objective was to affect the conduct of government, specifically Congress, and to do so through intimidation and coercion by means of force, both through the stockpiling of weapons in the event that they needed to be brought across the river—there was an agreement as to that—and then, of course, the actual use of force by others who went into the building and applied that force against police officers who were doing their duty that day."  05/25/2023 Sentencing Hearing Tr. 78:19–79:2.  It was no excuse for those defendants—and it should be no excuse for Wilson—that they were not personally convicted of assaulting a member of law enforcement with a deadly or dangerous weapon.  *See* 05/25/2023 Sentencing Hearing Tr. 111:10–13 ("It is true that neither Mr. Rhodes nor any of one of his conspirators used a weapon against a police officer, maimed a police officer that day, and there were those who did worse in terms of physical assaults.").

Judge Mehta further elaborated as to the appropriateness of Note 4 enhancement:

I think the way I get there is the nature of the conduct, and let me be clear . . . . [I]t's a separate and more serious conduct than what's captured by the Guideline.   And I say that because the Guideline itself does not necessarily require the level of intimidation and calculation and targeting that the terrorism enhancement—what we will call the terrorism enhancement in the note requires.

This is an additional level of calculation.   It is an additional level of planning.   It is an additional level of purpose.   It is an additional level of targeting, in this case, an institution of American democracy at its most important moment, the transfer of power. That's pretty significant.

42

05/25/2023 Sentencing Hearing Tr. 79:12–25.   The same is true here.   Wilson spent weeks

rallying others and preparing for an attack on the U.S. Capitol on the day that the peaceful transfer

of power was meant to take place.

The Court also highlighted the particularly insidious nature of a conviction for a count of

conspiracy.   The Court referenced *Callanan v. United States*, 364 U.S. 587 (1961), which states:

> Collective criminal agreement, partnership in crime presents a greater potential
> threat to the public than individual dealings.   Concerted action both increases the
> likelihood that the criminal object will be successfully attained and decreases the
> probability that the individuals involved will depart from their path of criminality.
>
> Group association for criminal purposes often, if not normally, makes possible the
> attainment of ends more complex than those which one criminal could accomplish.
> Nor is the danger of a conspiratorial group limited to the particular end toward
> which it has embarked.   Combination in crime makes more likely the commission
> of crimes unrelated to the original purpose for which the group was formed.   In
> sum, the danger which a conspiracy generates is not confined to the substantive
> offense which is the immediate aim of the enterprise.

*Id.* at 593–94; *see also* 05/25/2023 Sentencing Hearing Tr. 111:17–112:7.   Unlike most other

defendants for whom the government had sought this enhancement, but ultimately were denied in

that request, the Oath Keepers and Wilson have been convicted of a conspiracy whose object was

to obstruct the normal functioning of the government.   As with the Oath Keepers, this places

Wilson in a different category—one presenting a "greater potential threat to the public," *Callanan*,

364 U.S. at 593.[17]

This Court previously denied n.4's application in the case of Guy Reffit, *see United States*

---

[17] Judge Mehta also applied this enhancement in a nonconspiracy case where the court found the
defendant's conduct "clearly was calculated to influence or affect the conduct of government by
intimidation or coercion."   Sentencing Transcript at 78:3–11, *United States v. Soutard-Rumsey*,
21-cr-387 (July 14, 2023).

*v. Reffitt*, 21-cr-32, Sentencing Transcript at 83:15–87:10 (D.D.C. Aug. 1, 2022) (Friedrich, J.). But *Reffitt*'s Guidelines were ultimately sufficient for the Court to determine an appropriate sentence.   Here, however, the Guidelines as discussed above do not meaningfully capture the defendant's knowledge, intent, planning, and riotous conduct during a critical day in American history.   In fact, because the Guidelines are driven by the defendant's unlawful firearms offenses, the Guidelines do not capture his January 6 conduct almost at all, beyond the application of an addition point pursuant to the grouping analysis.   Thus, application of this departure (or the equivalent variance) is warranted.

### c.   Prior Applications of Note 4 Across the Country

Application of Note 4 to Wilson's conduct is consistent with the application of Note 4 by other courts around the country.   In *United States v. Doggart*, the sentencing court applied Note 4(A) where the defendant was convicted of soliciting the destruction of religious property in connection with his plan to burn down buildings in a Muslim community, seeking to "set[] in motion an armed insurrection against the government of the United States that would force the government of the United States either to respond to" the defendant's planned attacks, "or to give in and capitulate."   No. 15-cr-39-CLC-SKL (E.D. Tenn. Sep. 16, 2020), ECF 343 at 6.   The Sixth Circuit recently affirmed the application, agreeing that the defendant's offense was "calculated to influence or affect government conduct by intimidation or coercion."   *United States v. Doggart*, No. 20-6128, 2021 WL 5111912, at *2–4 (6th Cir. Nov. 3, 2021).   There, the sentencing court departed upward from an otherwise applicable Guidelines range that called for 51 to 63 months of imprisonment (equivalent to offense level 24 at Criminal History Category I) to a range of 324 to 405 months of imprisonment (equivalent to offense level 41 at Criminal History Category I).   *Id*.

After departing upward, the court sentenced the defendant to the statutory maximum for his sole offense of conviction, ten years of imprisonment.   *Id.* at *1.

In a separate case in the District of Oregon, the sentencing court applied Note 4(A) when sentencing multiple coconspirators convicted of violations under 18 U.S.C. § 372 and related offenses for their roles as part of Ammon Bundy's 2016 armed occupation of the Malheur National Wildlife Refuge, based on their disagreement with federal land management policies.   These coconspirators, some of whom were armed, formed a convoy, entered the Malheur refuge, and then set up a perimeter blocking the entrance of personnel from the Fish and Wildlife Service and other federal agencies.   As they indicated in public statements, the occupiers aimed to "adversely possess" the federal land at the Malheur refuge and to compel the release of two other ranchers who had been convicted of arson on federal land.   Although some defendants involved in the occupation claimed their actions were peaceful, certain defendants carried firearms as they patrolled the refuge, including in a fire watchtower where they stood guard, and one of the defendants was a member of the "Washington III%" militia.   The court applied a Note 4(A) upward departure to eleven of the thirteen defendants who had pled guilty (some of whom had agreed to the application of the departure in their plea agreements), departing upward two offense levels (one defendant), three offense levels (four defendants), five offense levels (three defendants), and ten offense levels (one defendant).   *See United States v. Patrick*, No. 16-cr-51 BR-9 (D. Or. Feb. 18, 2018), Sent. Tr. at 43–45.   The court then applied four- and two-level departures to two defendants convicted at trial.   *Id.* at 46; *United States v. Thorn*, No. 16-cr-51-BR (D. Or. Nov. 21, 2017), Sent. Tr. at 12.

Other sentencing courts have also departed upward under Note 4, although under a

different subsection, Note 4(B), where defendants' convictions "involved, or were intended to promote" an enumerated offense under 18 U.S.C. § 2332b(g)(5)(B) but the "terrorist motive was to intimidate or coerce a civilian population" rather than to influence or retaliate against government conduct.  *See United States v. Harpham*, 11-cr-42 (E.D. Wash.), applied in *United States v. Harpham*, 2012 WL 220276 (E.D. Wash. Jan. 25, 2012) (three offense-level Note 4(B) departure applied to defendant who placed explosive device along the Martin Luther King, Jr. Day parade targeting parade participants); *United States v. Cottrell*, 04-cr-279 (C.D. Cal.), *aff'd*, *United States v. Cottrell*, 312 F. App'x 979, 981 (9th Cir. 2009) (per curiam), *superseded on other grounds in* 333 F. App'x 213 (9th Cir. 2009) (per curiam) (after application of Note 4(B), defendant sentenced to 100 months of imprisonment for participating in conspiracy to commit vandalism and arson of SUVs in connection with environmental extremist organization); *United States v. Jordi*, 03-cr-60259 (S.D. Fla.), *aff'd*, *United States v. Jordi*, 418 F.3d 1212 (11th Cir. 2005) (after application of Note 4(B), defendant sentenced to 10 years of imprisonment in connection with conviction for planned bombing of abortion clinics meant to dissuade doctors from performing abortions); *see also United States v. Holzer*, 19-cr-488 (D. Colo.), ECF 101 at 1–5 (finding that Note 4(B) applied to defendant convicted of attempted arson of a synagogue, but describing 235-month sentence of imprisonment as the result of an upward "variance").

## V.      SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

Wilson's felonious conduct on January 6, 2021 was part of a massive riot that almost

succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of presidential power, and throwing the United States into a constitutional crisis. Moreover, those dangers were Wilson's goals.   Wilson planned with others for weeks to obstruct the peaceful transfer of power, including through the threatened use of force, as described above. The nature and circumstances of Wilson's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 60 months' imprisonment.   The defendant's record of lawlessness, including as shown through his collection of firearms while he knew he was a prohibited person by virtue of his extensive criminal history, is also incredibly serious and undergirds the government's recommended sentence of 60 months' imprisonment.

### B.      Wilson's History and Characteristics

The defendant has an extensive criminal history.   His criminal record began early, at age 18, with burglary charges, based on the residential theft of a shotgun and other property.   *See* PSR ¶ 105.   His record shows repeated parole and probation violations, demonstrating his inability to conform his conduct to the law even when given chances at leniency.   *See* PSR ¶¶ 105–07.   He has even escaped from prison before.   *See* PSR ¶ 105–06.   His criminal conduct continued intermittently from 1994 to 2011.   *See* PSR ¶¶ 105–113.[18]   And while Wilson has not had any criminal convictions since 2011, that is hardly comforting, given the serious nature of his January

---

[18] Despite this, the Guidelines provide the defendant with only one criminal history point, and a criminal history category of I.   This is significant.   In addition to understating the defendant's criminal history, the defendant also benefits from the consolidated nature of these sentencing proceedings.   Had the defendant been sentenced on the firearms offenses in the Western District of Kentucky, and had a sentence of at least thirteen months been imposed, his criminal history category in this proceeding would be III (4 points).   *See* U.S.S.G. § 4A1.1(a).   If the defendant were assessed at criminal history category III, even without an upward departure, his Guidelines would be 41–51 months, rather than 33–41 months.

6 conduct, his eagerness for violence, and his unlawful possession of multiple firearms, some of which he stored in a manner accessible for ready use or concealed in clothing.

Wilson's extensive criminal history and continued disrespect for the law and for our constitutional order are the most significant factors in his history and characteristics.   A lengthy sentence is warranted to ensure that he understands he has committed serious crimes that come with consequences, and to deter conduct like this again in the future.

### C.    The Need for the Sentence Imposed To Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration.   Wilson's crime was an attack on not just the Capitol, but the United States and its system of government.   He joined a mob and struck a blow to a central feature of the American system: the peaceful transfer of power.   The defendant sought out violence and endeavored to organize others to join him in his violent aims.   And he took his violent and revolutionary aspirations to Washington, D.C. and to the U.S. Capitol building, where he joined others in surrounding and breaching the building.   And he has underscored his dangerousness and lack of respect for the law by collection several firearms unlawfully.   A lengthy term of incarceration is necessary to reflect the seriousness of his crime and to promote respect for the law.

### D.    The Need for the Sentence To Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.   18 U.S.C.§ 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol and Wilson's conduct in particular

certainly was.[19]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

While Wilson has pleaded guilty, his public statements, through his Twitter account, reveal his lack of acceptance of responsibility.   Wilson is active on Twitter under the username @grayghost5933, where he describes himself as a "sheepdog patriot FJB Jan 6 Defendant."   His profile picture includes a call to "Bring Our J6ers Home," along with the logo for his Three Percenter militia.



As recently as the last few weeks, Wilson has publicly engaged with other January 6 defendants in complaining that he is a victim of "political persecution."   For example, on July 29, 2024, Wilson wrote, in a Tweet, "I'll be going to federal prison in a few weeks for trying to stand up for the people."[20]   A few days prior, another January 6 defendant wrote in a Tweet, "The

---

[19] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

[20] https://x.com/grayghost5933/status/1818037187059089442.

government is absolutely engaged in political prosecutions.   And these prosecutors left their home districts with the sole intent of prosecuting January 6 cases.   Meanwhile, the D.C. U.S. attorney drops charges on armed J6 antifa, local criminals, and the pro-hamas protestors!"   Wilson replied, "Absolutely. . . ."[21]

In other Tweets, Wilson promoted the dangerous conspiracy theory that January 6 was a false flag operation.[22]   And Wilson has embraced calls for the jailing of politicians he disagreed with.   On May 12, 2024, another user tweeted, "Liz Cheney should be put in PRISON for J6. Adam Schiff should be put in PRISON for J6.   Jamie Raskin should be put in PRISON for J6. Nancy Pelosi should be put in PRISON for J6.   What DO YOU think ?"   The account responded to its own Tweet, "The J6 'committee' should take the place of every J6 prisoner.   Free J6 now." Wilson responded, "3 1/2 years of talking.   I'm a few weeks away from going to prison for 3 years.   I committed no violence or destruction.   Tired of words.   We need action!!!"[23]

Wilson has also used his Twitter account to engage in myth making and to assume the mantle of January 6 hero, rather than accept responsibility.   On May 5, 2024, Wilson retweeted a flyer posted by another account, which read, "I pledge by LIFE, my FORTUNE, and my SACRED HONOR to saving our Republic and I will fight until my dying breath.   Take the founders pledge with me by liking and sharing."   Wilson replied, "I'm going back to prison after 22 years because

---

[21]  https://x.com/grayghost5933/status/1816960398924677572.

[22]  *See, e.g.*, https://x.com/Helenagibs/status/1782148926801392084 (Wilson retweeted message, including #J6WasASetup, #FedSurrection, and #ReleaseTheJ6Hostages); https://x.com/-Helenagibs/status/1754205683233280107 (Wilson retweeted image reading "J6 was an inside job. Never forget.").

[23]  https://x.com/grayghost5933/status/1789717701813768411.

I stood in the gap while our country goes to shit.   Sleep doesn't come easily."[24]   In another Tweet, from March 3, 2024, Wilson defended his conduct, claiming the mantle of protector: "And because a lot of us are being persecuted by the government and law enforcement for doing their job!! Most, if not all of us, will stay at home next time!!"[25]

In February and March 2024 Tweets, Wilson posted the below photographs of himself with Kuntz, holding up and raising a sign that reads, "FREE THE J6ERS."[26]



In a December 7, 2023, Wilson also promoted an interview he had participated in regarding his January 6, 2021 conduct.[27]   *See* Exhibit 41.   In that interview, Wilson tried to cover up his

---

[24] https://x.com/grayghost5933/status/1786496313699209521.

[25] https://x.com/grayghost5933/status/1764290378771939420.

[26]   https://x.com/grayghost5933/status/1768059695040729129;   https://x.com/grayghost5933/-status/1763379018018029584.

[27] https://x.com/grayghost5933/status/1732827586282053700.

January 6 conduct and assume the role of hero.   He told the interviewer, "I was there to make sure people could go to the Trump rally and get back and forth safely from their vehicles."   *Id.* (3:45–3:55).   Wilson reiterated throughout the interview that his plans were just to attend the rally and protect others.   *See id.* (7:45–8:26).   In the interview, in addition to identifying himself as a Three Percenter, Wilson stated he was also a second-degree Proud Boy.   *See id.* (6:00–6:45).   Wilson praised the Oath Keepers and discussed his prior meetings with "Stewart," "Jen," and "Ken," referring to leaders of the Oath Keepers.   *Id.* (11:08–12:30).   Wilson blamed the riot on "infiltration by the left" and "undercover law enforcement," and he claimed he did not have any weapons on him.   *Id.* (13:40–16:00).   He also blamed the reaction of law enforcement for inciting the crowd.   *See id.* (20:30–21:14).   Throughout the interview, he blamed everyone but himself. He never acknowledged any wrongdoing or expressed any regret.

Wilson's plea is a formal acknowledge of guilt, but his statements since then reveal that he has never truly accepted responsibility.   And Wilson's continued lack of remorse and denial of responsibility undermines any last-minute claims of remorse he may offer.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29–30 ("[The defendant's] remorse didn't come when he left that Capitol.   It didn't come when he went home.   It came when he realized he was in trouble.   It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day.   It came when he realized that he could go to jail for what he did.   And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).   The certification of the Electoral College vote takes place every four years.   Nothing in Wilson's conduct or statements to date suggest he will not come back for the next certification he disagrees with to engage in the same dangerous and

obstructive conduct.   He must be deterred.

### E.        The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards."   *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines."   *Id.* at 101.   The Court should do so here, but the Court should also recognize the mismatch between the defendant's aggravated conduct, and the Guidelines for the standard crime, as well as the Guidelines to adequately capture the additional harm of the defendant's January 6 conduct, in addition to his firearms offenses.

### F.        Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added).   As long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of

unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."   *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).   The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."   *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).   "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."   *Id*. at 1095.   "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."   *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[28]   "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of

---

[28] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct.   *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24–25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned

up).   Although all the other defendants discussed below participated in the Capitol breach on

January 6, 2021, many salient differences explain the differing recommendations and sentences.

While no previously sentenced case contains the same balance of aggravating and mitigating

factors present here, the sentences in the following cases provide suitable comparisons to the

relevant sentencing considerations in this case.

As a member of a conspiracy to impede or injure law enforcement or Members of Congress,

in order to obstruct the certification of the Electoral College vote, Wilson has few peers.   The

most comparable cases are those defendants who been found guilty of conspiracy offenses under

§§ 1512(k), 372, or 371.   Four cases are worth noting: the Oath Keepers, 1:22-cr-15 (APM), and

Proud Boys, 1:21-cr-175 (TJK), conspiracy cases, both of which included 18 U.S.C. § 2384

(Seditious Conspiracy) charges; a § 371 conspiracy case focused on another group from California,

*United States v. Rodriguez, et al.*, 21-cr-246 (ABJ); and a § 1512(k) conspiracy case focused on

another group from California, *United States v. Hostetter, et al.*, 21-cr-392 (RCL).   Among these

cases, the following sentences have been imposed to date[29]:

- Oath Keeper Elmer Stewart Rhodes, 1:22-cr-15 (APM), who was convicted of
  violating 18 U.S.C. § 2384, was sentenced to 216 months' incarceration.

- Oath Keeper Kelly Meggs, 1:22-cr-15 (APM), who was convicted of violating 18
  U.S.C. §§ 2384, 1512(k), and 372, was sentenced to 144 months' incarceration,
  including 72 months (the statutory maximum) for § 372.

- Oath Keeper Kenneth Harrelson, 22-cr-15 (APM), who was convicted of violating

---

[29] In addition to these cases, Dominic Pezzola, 1:21-cr-175 (TJK), a defendant in the Proud Boys
conspiracy case, was sentenced to 180 months' incarceration for his conviction for 18 U.S.C.
§§ 1512(c)(2) and 2.   Pezzola had been charged with § 1512(k) and § 2384 but was convicted of
neither.

18 U.S.C. § 372, was sentenced to 48 months' incarceration.

- Oath Keeper Jessica Watkins, 1:22-cr-15 (APM), who was convicted of violating 18 U.S.C. §§ 2384, 1512(k), and 372, was sentenced to 102 months' incarceration, including 72 months for § 372.

- Oath Keeper Robert Minuta, 1:22-cr-15 (APM), who was convicted of violating 18 U.S.C. §§ 2384, 1512(k), and 372, was sentenced to 54 months' incarceration.

- Oath Keeper Joshua Hackett, 1:22-cr-15 (APM), who was convicted of violating 18 U.S.C. §§ 2384, 1512(k), and 372, was sentenced to 42 months' incarceration.

- Oath Keeper David Moerschel, 1:22-cr-15 (APM), who was convicted of violating 18 U.S.C. §§ 2384, 1512(k), and 372, was sentenced to 36 months' incarceration.

- Oath Keeper Edward Vallejo, 1:22-cr-15 (APM), who was convicted of violating 18 U.S.C. §§ 2384, 1512(k), and 372, was sentenced to 36 months' incarceration.

- Proud Boy Ethan Nordean, 1:21-cr-175 (TJK), who was convicted of violating 18 U.S.C. §§ 2384, 1512(k), and 372, was sentenced to 216 months' incarceration, including 72 months for § 372.

- Proud Boy Joseph Biggs, 1:21-cr-175 (TJK), who was convicted of violating 18 U.S.C. §§ 2384, 1512(k), and 372, was sentenced to 204 months' incarceration, including 72 months for § 372.

- Proud Boy Zachary Rehl, 1:21-cr-175 (TJK), who was convicted of violating 18 U.S.C. §§ 2384, 1512(k), and 372, was sentenced to 180 months' incarceration, including 72 months for § 372.

- Proud Boy Enrique Tarrio, 1:21-cr-175 (TJK), who was convicted of violating 18 U.S.C. §§ 2384, 1512(k), and 372, was sentenced to 240 months' incarceration, including 72 months for § 372.

- Daniel Rodriguez, 1:21-cr-246 (ABJ), who was convicted of violating 18 U.S.C. § 371, was sentenced to 151 months' incarceration.

- Edward Badalian, 1:21-cr-246 (ABJ), who was convicted of violating 18 U.S.C. § 371, was sentenced to 51 months' incarceration.

- Alan Hostetter, 1:21-cr-392 (RCL), who was convicted of violating 18 U.S.C. § 1512(k), was sentenced to 135 months' incarceration.

In light of the prominent role assumed by Wilson in the relevant Telegram groups and his efforts to organize others with calls for violence, these defendants are the most closely analogous to Wilson.   Notably, for each of the sentences noted above for which a § 372 offense was included, the sentencing court imposed the same sentence for the § 372 conviction as it did for the § 2384 conviction, rather than making a distinction between the two counts.   Further making these cases analogous to Wilson's, it is notable that among these defendants, only two—Dominic Pezzola and Daniel Rodriguez—received a conviction for assaultive conduct.

Among these, the United States submits Edward Badalian as a suitable comparator. Edward Badalian was convicted of two felonies—under Sections 1512(c)(2) and 371 (based on a conspiracy to obstruct the official proceeding).   Like Wilson, Badalian did not personally assault officers, but he had engaged in the same advance planning and promoted the same revolutionary ideology that brought Wilson to the Capitol on January 6, 2021.   Like Wilson, Badalian proclaimed to have a history of violent confrontations with individuals he believed were antifa activists.   Like Wilson, Badalian had a leading role in a Telegram chat focused on bringing people together in advance of January 6.   Unlike Wilson, Badalian did not accept responsibility through a guilty plea, and Badalian testified at trial falsely, which were significant aggravating factors present in Badalian's case that are absent here.   Based on Badalian's conduct, including his extensive organizing and violent rhetoric, the Court imposed a sentence of 51 months' imprisonment.   *See United States v. Badalian*, 21-cr-246-2 (ABJ), ECF No. 223 (D.D.C. Sept. 28, 2023); *see also id.*, ECF No. 175 (D.D.C. Apr. 20, 2023).   But there are significant factors present in Wilson's case supporting a sentence longer than that received by Badalian.   Unlike Badalian, who had no criminal history, Wilson has an extensive criminal history.   Moreover, unlike

57

Badalian, Wilson is being sentenced for distinct criminal conduct based on his unlawful possession of firearms.   While both men stormed the Capitol with similarly revolutionary aims, and had organized for it in advance, Wilson's extensive criminal history and separate convictions for unlawful possession of firearms support a longer sentence than that received by Badalian.

Wilson is in a rare class.   Although he did not commit any acts of violence, his role in preparing for violence and helping to organize a conspiracy makes him particularly dangerous. Moreover, Wilson is further in the rare category of being sentenced for non-January 6 conduct, based on his subsequent unlawful possession of multiple firearms, which is further evidence of his lawlessness, dangerousness, and the need for a significant term of incarceration.   Indeed, this plea allows him acceptance of two distinct crimes from two distinct time periods with two different harms.   By engaging in a combined plea as he did, the defendant appropriately receives a benefit of a single sentencing hearing.   But such a merged hearing does not undercut the severity of the crime, and the need to punish and deter for such distinct conduct.   A sentence of 60 months' imprisonment is appropriate.

## VI.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."   *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[30]   Generally, restitution under the VWPA must "be tied to the loss

---

[30] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Wilson must pay $2,000 in restitution, which reflects in part the role he played in the riot on January 6.[31]   ECF No. 56 at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023.   *Id.*   Wilson's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.   *See* ECF No. 56 at ¶ 12; PSR ¶ 206.

## VII.   FINE

The defendant's convictions subject him to statutory maximum fines of $250,000 (for the Section 372 and 922(g)(1) offenses), *see* 18 U.S.C. § 3571(b), and $10,000 (for the Section

---

[31] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA.   *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property . . . including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss."   18 U.S.C. § 3663A(c)(1).

5861(d) offense), *see* 26 U.S.C. § 5871.   In determining whether to impose a fine, the sentencing

court should consider the defendant's income, earning capacity, and financial resources.   *See* 18

U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d).   The Guidelines require a fine in all cases, except where

the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.

U.S.S.G. § 5E1.2(a).   Here, the defendant's financial assets set forth in the PSR suggest that the

defendant is unable, and is unlikely to become able, to pay a fine.   *See* PSR ¶¶ 152–64.

## VIII.   CONCLUSION

For the reasons set forth above, the United States recommends that the Court impose a

sentence of 60 months' incarceration, 36 months supervised release, and $2,000 restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     */s/ Anthony W. Mariano*
ANTHONY W. MARIANO, MA Bar No. 688559
Trial Attorney, Detailee
Capitol Siege Section
United States Attorney's Office
for the District of Columbia
601 D Street N.W.
Washington, DC 20530
(202) 476-0319
Anthony.Mariano2@usdoj.gov

60